**FILED**
Lucinda B. Rauback, Acting Clerk
United States Bankruptcy Court
Augusta, Georgia
*By jpayton at 10:24 am, Sep 25, 2012*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Augusta Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Case |
| | ) | Number 10-12496 |
| DAVID MCDOWELL BARBEE, JR. | ) | |
| JULIE L. BARBEE, | ) | |
| | ) | |
| Debtors | ) | |
| | ) | |
| JOHN L. THOMPSON, GEORGE N. | ) | Adversary Proceeding |
| SNELLING, T. FACTOR LLC, and | ) | Number 11-01006 |
| SA, LLC, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID MCDOWELL BARBEE, JR., | ) | |
| | ) | |
| Defendant | ) | |

## OPINION AND ORDER

Before the Court is the complaint filed by John L. Thompson, George N. Snelling, T. Factor, LLC and SA, LLC (collectively "Plaintiffs") seeking a denial of discharge of all David McDowell Barbee, Jr.'s ("Debtor"['s]) debts pursuant to 11 U.S.C. §727(a)(4)(A), and alternatively seeking a determination that the $100,000.00 loan from Plaintiffs to Debtor is non-dischargeable pursuant 11 U.S.C. §523(a)(2)(A), (4) and (6) and such other and further relief as this Court deems just and proper. This is a

✎AO 72A
(Rev. 8/82)

core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and (J) and jurisdiction is proper under 28 U.S.C. §1334. For the following reasons, I find Debtor is entitled to a discharge, but $44,462.27 is nondischargeable pursuant to 11 U.S.C. §523(a)(2) and (a)(6).

## FINDINGS OF FACT

Debtor filed his chapter 7 bankruptcy petition on October 28, 2010.[1] Debtor is one of the shareholders in a corporation known as HRP Nursing Services, Inc. ("HRP"). Debtor's mother, Deborah H. Barbee, is the only other shareholder of HRP. She has not filed a bankruptcy petition.

HRP was a nurse staffing business that provided nurses to various hospitals and other medical facilities in Georgia and South Carolina. HRP was paid by the hospitals and other medical facilities on a per hour basis for the nurses supplied by HRP. HRP, in turn, paid the nurses. All of the nurses were acting as independent contractors. The hospitals would remit a gross amount to HRP to cover both the payment to the nurses and a placement fee to HRP. Typically 75% went to the nurse and 25% went to HRP. The nurses would go to HRP's offices to collect their payments shortly after their shift. HRP's latest financial

---

[1] Debtor filed a joint bankruptcy petition with his wife, Julie L. Barbee. Julie L. Barbee is not a party to this adversary proceeding.

troubles began when the business model changed resulting in HRP not receiving payment from the hospitals as quickly. Also, as part of various cost saving initiatives, some hospitals began to directly supply the nurses which drastically reduced HRP's revenues. HRP ultimately ceased operations in September 2010.

For a number of years prior to November 1, 2007, Plaintiffs had provided financing to HRP in various forms, including a factoring arrangement by which HRP's accounts receivable served as collateral. On November 1, 2007, the financing arrangements between HRP, Plaintiff John L. Thompson (acting individually or through the assets of John L. Thompson, P.C. Profit Sharing Plan) (collectively "Thompson") and Plaintiff George N. Snelling (acting individually or through the assets of SA, LLC) (collectively "Snelling") were renewed and formalized in a series of documents consisting of the following:

> Financial Agreement - November 1, 2007 [Pls.' Ex. No. 1];
> Receivables Security Agreement - November 1, 2007 [Pls.' Ex. No. 2];
> Stock Pledge Agreement - November 1, 2007 [Pls.' Ex. No. 3];
> Guaranty - November 1, 2007 [Pls.' Ex. No. 4];
> Agency Agreement - November 1, 2007 [Pls.' Ex. No. 5];
> Promissory Note - November 1, 2007 - $123,000.00 [Pls.' Ex. No. 6];
> Promissory Note - November 1, 2007 - $265,000.00 [Pls.' Ex. No. 7]; and
> Promissory Note - November 1, 2007 - $92,000.00 [Pls.' Ex. No. 8].

On November 1, 2007, Thompson renewed the prior loans (the original loans having been made in approximately 2002) to HRP in the sums of $265,000.00 and $123,000.00, respectively, which represented a line of credit for HRP. HRP executed promissory notes for these loan renewals. Pls.' Ex. Nos. 6 and 7. Debtor personally guaranteed these two debts. Id. Debtor's bankruptcy schedules reflect that Thompson has a $388,000.00 claim. Chap. 7 Case No. 10-12496, Dckt. No. 1, Sch. F, p. 19.

On November 1, 2007, Snelling loaned HRP the sum of $92,000.00, also to be used as a line of credit for HRP's operations. HRP executed a promissory note payable to Snelling for this loan. Pls.' Ex. No. 8. Debtor personally guaranteed this debt. Id. The debt to Snelling is reflected in Debtor's Schedule F in the amount of $89,000.00. Chap. 7 Case No. 10-12496, Dckt. No. 1, Sch. F, p. 19.

Thompson and Snelling each appointed T. Factor, LLC to act as paying agent. Pls.' Ex. No. 5. On November 1, 2007, HRP and T. Factor, LLC executed a Financial Agreement governing the terms of HRP's obligations to T. Factor, LLC, as agent for Plaintiffs. Pls.' Ex. No. 1. The Financial Agreement provided that the parties (including Debtor) would enter into a Stock Pledge Agreement, a Receivable Security Agreement, and a Guaranty

Agreement further securing HRP and Debtor's obligations to T. Factor, LLC as agent for Plaintiffs. HRP executed a Receivables Security Agreement, assigning to T. Factor, LLC a security interest in HRP's accounts receivable and Plaintiffs perfected this interest through a UCC Financing Statement. Pls.' Ex. No. 2. There are no allegations that these loans were not duly perfected.

In 2008, Debtor failed to timely remit some payroll withholding taxes to the IRS for approximately five non-nurse employees,[2] including Debtor and his mother. This resulted in HRP and Debtor being assessed a tax liability. Debtor did not advise the Plaintiffs about this tax liability until late summer or early fall, 2009. This tax liability ultimately reached $44,462.27.

The changing business model caused HRP cash flow difficulties because it increased the lag between when HRP had to pay the nurses and its receipt of funds from the respective hospitals. HRP needed a cash infusion to address this change in business model and to address this tax liability. After discussions, Plaintiffs agreed to provide an additional loan to

---

[2] Apparently, through prior litigation it was determined the nurses were independent contractors and not subject to withholding taxes.

HRP of $100,000.00 in February 2010 to be used for nurse payroll funding.  Plaintiffs were willing to loan these additional funds to HRP on the condition that certain strict terms regarding the management of the business and the use of the revenues were agreed to by Debtor and HRP.  The parties incorporated the new terms into a document known as "Reorganization Agreement for HRP Nursing Services, Inc." ("Reorganization Agreement") dated February 24, 2010.  Pls.' Ex. No. 9.

Under the Reorganization Agreement, all accounts receivable of HRP were to be deposited into an account controlled by T. Factor, LLC.  More specifically, the Reorganization Agreement provided as follows:

> George N. Snelling and John L. Thompson will provide an additional $100,000.00 for nurse payroll funding.  The funding shall be through a new T-Factor Account.  T. Factor will write all checks to the company upon receipt of nurse funding request.  All payments from hospitals shall be sent directly to T-Factor.

Pls.' Ex. No. 9.  In this manner, Plaintiffs would have control over the receivables of HRP which served as collateral for their loan.  HRP also had two bank accounts with Wachovia Bank identified as the Operating Account and the Nurse Account. Thompson and Snelling had signature authority on the Operating Account but not on the Nurse Account.  Dckt. No. 49, Tr. of Hr'g

held Feb. 28, 2012. pp. 149, 171. Generally, Debtor would collect the accounts receivable from HRP's post office box and Thompson would pick up the checks and make the deposit into the T. Factor account. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. pp. 65-68. When HRP needed money for the Nurse Account or Operating Account, Debtor would supply Thompson with the amount of checks written on a certain day and Thompson would issue a T. Factor check for these debits and deposit it into the respective account. Id.

Under the terms of the Reorganization Agreement, Debtor's monthly compensation was limited to $2,500.00 per month, plus a share of any net profits. The Reorganization Agreement was silent on funding for travel expenses and business supplies. The Agreement also provided for payments of $2,000.00 per month to the IRS for delinquent payroll taxes.

Contrary to the terms of the Reorganization Agreement, Debtor paid himself additional compensation out of the Nurse Account, in an amount of at least $2,190.96 comprised of the following checks:

$425.50 on 7-23-2010 [Pls.' Ex. No. 38D];

$450.00 on 8-9-2010 [Pls.' Ex. No. 38H];

$300.00 on 8-13-2010 [Pls.' Ex. No. 38I];

$502.46 on 9-3-2010 [Pls.' Ex. No. 38K]; and

$513.00 on 9-10-2010 [Pls.' Ex. No. 38N].  Similar payments were made to Debtor's mother in at least the amount of $6,485.00. Debtor was able to do this without the knowledge of Plaintiffs because the checks written by T. Factor purportedly for nurse charges were placed in HRP's Nurse Account and checks written on the Nurse Account did not require the signature of Plaintiffs. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. pp. 81-82.  As previously stated, Plaintiffs did not have authority to sign checks on the Nurse Account.  Debtor acknowledges these payments were unauthorized and that he did not inform Plaintiffs about them.  Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. pp. 81-82. Debtor argues he was entitled to a percentage of net profits and that some of these checks may have been for business expenses. Thompson admits the monthly profits may have reached a level whereby Debtor may have been entitled to additional compensation in at least one month, but no calculation has been done and Thompson contends these payments to Debtor and his mother were unauthorized.  Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, pp. 177-78.

Debtor also acknowledged using an American Express credit card and a Discover card.  According to Debtor the seven

$200.00/month payments ($1,400.00 total) automatically drafted to pay American Express were for business debts. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. p. 90; Pls.' Ex. No. 10.   As to the Discover card, Debtor stated it was used for business expenses after the Reorganization Agreement was entered.   Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. p. 94.   Although he also stated that one-third of the Discover charges may have been for personal expenses. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, pp. 99. It is undisputed that prior to entering the Reorganization Agreement, Debtor used the credit card for business and personal expenses.   After entering the Reorganization Agreement, Debtor states that Thompson knew of the Discover card purchases.   Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. p. 100-101.

Both Debtor and Thompson acknowledged that the Reorganization Agreement was not strictly followed, and at various times some conditions were waived by the parties.   Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, p. 116, p. 175. Operating necessities resulted in Debtor writing some checks from the Operating Account without Plaintiffs' signature, but prior to the October payment to IRS, Debtor informed Thompson of these expenditures.

On September 21, 2010 and September 27, 2010, Debtor provided Plaintiffs with documentation of HRP's accounts receivable. Pls.' Ex. Nos. 14 and 15. On or about September 30, 2010, Debtor informed the Plaintiffs that he was "closing the doors" of HRP and could no longer viably operate the business. At this time, Plaintiffs asked Debtor to remain on to collect the accounts receivable since he had the contacts with the hospitals. Plaintiffs agreed to pay Debtor a fee for collecting the accounts receivable. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, p. 147 and 154. According to Thompson, Plaintiffs allowed Debtor to collect the receivables because based on the accounts receivable reports submitted by Debtor, the accounts receivable exceeded his $100,000.00 investment. Id. Debtor proceeded with collecting these receivables.

Thompson testified that prior to the September meeting he and Debtor would talk three or four times a week; however, after the September meeting, Debtor would no longer return Thompson's calls and they did not talk until Debtor's deposition in October of 2011. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, p. 154-55.

On or before October 14, 2010, Debtor retained an attorney[3] for the purpose of filing a personal bankruptcy petition. Debtor delivered to his attorney the following accounts receivable checks of HRP:

> Comforce Technical Svcs, Inc. 9/16/2010 $12,257.46;
> Comforce Technical Svcs, Inc. 9/23/2010 $9,118.39;
> All About Staffing, Inc. 9/23/2010 $9,043.07;
> HCR Manor Care 9/29/2010 $1,632.00;
> Palmetto Baptist Medical Center 10/1/2010 $5,809.05;
> Providence Hospitals 10/05/2010 $1,704.70.
> HCR Manor Care 10/6/2010 $3,264.00;
> All About Staffing, Inc. 10/6/2010 $7,886.34; and
> Providence Hospitals 10/19/2010 $526.38;

Pls.' Ex. No. 16. These nine checks were deposited into the attorney's trust account. Pls.' Ex. No. 16. From these funds, on the purported advice of counsel, Debtor authorized these funds be used to make four separate payments on certain tax obligation owed to the Internal Revenue Service totaling $44,462.27. Pls.' Ex. No. 16. After receipt of these payments, the IRS released its tax lien against HRP, Debtor, and Debtor's mother. Also, on the purported advice of counsel, Debtor again authorized the remaining funds in the trust account in the total amount of

---

[3] The attorney representing Debtor in the underlying bankruptcy case is not the same attorney representing Debtor in this adversary proceeding. The attorney in the underlying bankruptcy case was subpoenaed on the Friday before he was to testify at the Tuesday trial. Upon the attorney's emergency motion to quash, the Court found the subpoena did not allow a reasonable time to respond and Plaintiffs' attorney withdrew his subpoena at the trial. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, p. 205.

$6,779.12 to be paid over to HRP. Pls.' Ex. No. 16. Debtor testified he placed these funds into his attorney's trust account because he wanted transparency of the deposits and expenditures. Thompson testified he had contacted Mr. Trotter, HRP's attorney in October 2010 to file for an accounting by Debtor and to pursue collections from the hospitals. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, pp. 121, 156 and 164.

Plaintiffs argue the following inaccuracies and omissions in Debtor's schedules should prevent Debtor's discharge: Debtor's schedule I states that HRP was closed in July 2010 when it was actually closed in September 2010; Debtor's Statement of Financial Affairs, question 1 fails to show any of Debtor's income from 2010, which is the year he filed bankruptcy and during the time period he purportedly improperly paid himself compensation through the Nurse Account and credit card payments; and Debtor's Statement of Financial Affairs, question 3 fails to disclose the October 2010 payment to the IRS. Debtor was made aware of these deficiencies at the §341 meeting of creditors, but he has failed to duly amend his schedules.

### CONCLUSIONS OF LAW

The issues before the Court are whether Debtor should be denied a discharge pursuant to 11 U.S.C. §727(a)(4) due to

omissions in his schedules and statement of financial affairs and whether the debt owed to Plaintiffs is excepted from discharge pursuant to 11 U.S.C. §523(a)(2), (4) or (6).

Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. In re St. Laurent II, 991 F.2d 672, 680 (11th Cir. 1993); In re Walker, 48 F.3d 1161, 1164-65 (11th Cir. 1995). Plaintiffs have the burden of establishing that Debtor is not entitled to receive a discharge by the preponderance of the evidence. Bullock v. BankChammpaign, N.A. (In re Bullock), 670 F.3d 1160 (11th Cir. 2012) citing Grogan v. Garner, 498 U.S. 279 (1991); In re Chalik, 748 F.2d 616 (11th Cir. 1984) (burden on objecting party); In re Metz, 150 B.R. 821 (Bankr. M.D. Fla. 1993)(standard of proof is preponderance of the evidence).

## 11 U.S.C. §727(a)(4)

Pursuant to 11 U.S.C. §727(a)(4)Plaintiffs argue, Debtor is not entitled to a discharge due to omissions and inaccuracies in his bankruptcy schedules and statement of financial affairs. Section 727(a)(4) prohibits a discharge to be granted when:

> the debtor knowingly and fraudulently, in or in connection with the case—
>
> (A)  made a false oath or account.

11 U.S.C. §727.

"Denying a debtor a discharge [under §727] is a drastic remedy. . . [and] [i]n light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party, with the burden of proof thereunder resting squarely upon the latter." In re Glatt, 315 B.R. 511, 517 (Bankr. D.N.D. 2004)(internal citation omitted). To establish a §727(a)(4) claim, Plaintiff must demonstrate "the debtor knowingly made [a] false statement with the specific intent to defraud." Bank of Miami v. Espino (In re Espino), 806 F.2d 1001, 1002 (11th Cir. 1986). "[A] false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent." 6 Collier on Bankruptcy ¶727.04[1][a] (15th ed. rev'd 2006). A knowing omission from a statement of financial affairs or a schedule may be a false oath. In re Chalik, 748 F.2d at 618, n. 3 (11th Cir. 1984). The false oath must be material. Chalik, 748 F.2d at 618. A false oath is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Id. Even if debtor can exempt all omitted items if he had duly listed them, the omission is material because a debtor is not

automatically entitled to any particular exemption and the omission negates the creditors' right to object to claimed exemptions. In re Horton, 252 B.R. 245, 248 (Bankr. S.D. Ga. 2000). In Horton, the debtor failed to disclose a shotgun, horse, two junk trucks and horse equipment. After hearing the reasons for the omissions, observing debtor's demeanor and finding his explanation not credible, the court concluded that debtor knowingly and fraudulently omitted items that were material to the bankruptcy and denied the discharge under §727(a)(4). Id. at 248.

In Chalik, the debtor failed to list his interest in at least five corporations that had assets in excess of $2 million. The debtor only disclosed this information upon specific questioning by the trustee. Id. at 619. The court pointed out that even if the debtor's interest in these corporations was worthless, "the bankruptcy court could reasonably infer that Chalik omitted information necessary to determining his financial condition." Id. The veracity of debtor is essential to successful administration of the bankruptcy code. Id. at 618.

In the current case, Plaintiffs' §727 count alleges Debtor made false statements on his bankruptcy schedules by: failing to list his 2010 income on question 1 of the SOFA; failing to

include payments by HRP on his personal credit card debt in his 2007-2009 income; failing to list the payments of the IRS debt which were made within 90 days of the petition date and failing to reflect the federal tax lien in his Schedules D, E, or F; and falsely representing HRP closed on July 23, 2010 when it was really closed in September 2010.

At the hearing, Debtor testified the omission of his income in question 1 of his Statement of Financial Affairs and the statement that HRP closed in July rather than September were typographical errors. He said he and his attorney became aware of the errors at the meeting of creditors and he thought his attorney would correct the errors as he had given that information to his attorney. There is no evidence of Debtor's failure to candidly provide this information at the §341 meeting of creditors. However, the schedules were never amended. After considering the testimony and observing Debtor's demeanor, I agree this was a typographical error and does not rise to level, in the totality of the circumstances to deny Debtor's discharge.

Furthermore, Debtor testified he relied on his accountant to determine income and some of the income was reimbursement for business expenses or for loans and he would have to amend his personal tax returns to properly account for these items. Not

unlike many small, family-run businesses, personal expenses sometimes got commingled with corporate expenses. After considering the totality of the circumstances and observing Debtor's demeanor, I find Debtor's testimony credible and find these omissions do not rise to level necessary to deny Debtor's discharge.

Turning to the omission of the payment of the IRS debt from Question 3 of his Statement of Financial Affairs ("SOFA"), Question 3 states:

> List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

Statement of Financial Affairs, Question 3, Chapter 7 Case No. 10-12496, Dckt. No. 1. For purposes of the schedules, Debtor stated he thought of the debt as HRP's debt and not his personal debt in the sense of buying a car or a home and so he did not think he needed to list the transfer to the IRS. However, Debtor admits he was a responsible party and liable for the debt. Debtor's stance on his schedules is consistent with his defense in this adversary proceeding. After considering Debtor's

testimony and observing his demeanor, I do not find his stance to be a knowingly and fraudulently made false oath as contemplated by §727(a)(4).

Furthermore, there is a question as to whether he would be required to list the transfer as the language of question 3 is ambiguous. See In re Cornelius, 333 B.R. 850 (Bankr. N.D. Fla. 2005)(finding the language of SOFA question 3 ambiguous as whether a debtor must reveal a transfer made by a third party for the debtor's benefit). In this case, Debtor authorized the transfer of HRP's funds on Debtor's behalf.

For these reasons, after considering the issue in light of the totality of the evidence, I find Plaintiffs failed to carry their burden of proof to establish that Debtor should be denied a discharge pursuant to §727(a)(4).

## 11 U.S.C. §523(a)(2)

Plaintiffs allege their debt is non-dischargeable pursuant to 11 U.S.C. §523(a)(2), which states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. §523(a)(2).

To establish fraud pursuant to 11 U.S.C. §523(a)(2)(A), Plaintiffs must prove:

> (i) the debtor made a false representation to deceive the creditor;

> (ii) the creditor relied on the misrepresentation;

> (iii) the reliance was justified; and

> (iv) the creditor sustained a loss as a result of the misrepresentation.

SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998). Plaintiffs allege that at the time the Reorganization Agreement was entered in February 2010, Debtor never intended to pay the $100,000.00 loan based on the following conduct: 1) Debtor's utilization of credit cards to pay personal expenses; 2) Debtor paying himself from the Nurse Account without Plaintiffs' knowledge or authorization; and 3) Debtor failing to remit accounts receivable to Plaintiffs; and paying the IRS debt instead of Plaintiffs' debt.

"[A] mere breach of contract by the debtor or a mere failure to fulfill a promise to pay, is, without more, insufficient to establish non-dischargeability. . . . By the same token, however, fraud can be established from circumstantial evidence." Bell v. Sturgess (In re Sturgess), Chapter 7 Case No. 90-41750, Adv. No. 90-4210 (Bankr. S.D. Ga. May 22, 1991) (J. Davis); see also, Lail v. Weaver (In re Weaver), 174 B.R. 85, 90 (Bankr. E.D. Tenn. 1994); Mason Lumber Co. v. Martin (In re Martin), 70 B.R. 146, 150 (Bankr. M.D. Ala. 1987)("[F]raud is not usually found in promises to act in the future."). Specifically, courts may look at a party's pre- and post-transaction conduct to determine fraudulent intent at the time the promise was made. Williamson v. Busconi, 87 F.3d 602, 603 (1st Cir. 1996)("subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made.").

First, Plaintiffs contend Debtor purposefully avoided the check writing requirement set forth in the Reorganization Agreement by Debtor's utilization of the electronic drafting and paying himself from the Nurse Account. The electronic drafting purportedly allowed Debtor to cover personal expenses on HRP's American Express and Discover credit cards as well as other

payments to his as well as his mother's Bank of America account. Conversely, Debtor testified credibly that the drafts for the American Express credit cards were business expenses and not personal debts. As far as the Discover card, Debtor acknowledged that traditionally about one-third of the charges were for personal expenses. However, he testified that when he did use the card for personal expenses, Thompson knew of the usage. Debtor stated, and Thompson agreed, that some of the strict conditions/formalities of the Reorganization Agreement were waived at times. Furthermore the Reorganization Agreement does not expressly limit the use of credit cards for business expenses. Payments on these accounts were made by automatic drafts. This is how payments were made before and after execution of the Reorganization Agreement. Debtor did not sign any checks for these payments. Given these facts, I do not find Debtor made a false oath with intent to deceive Plaintiffs. Furthermore, I find Plaintiffs failed to carry their evidentiary burden as no credit card statements were tendered to differentiate the expenses between business and personal expenses.

Plaintiffs also contend Debtor's personal use of the funds in the Nurse Account is further evidence that Debtor never

intended to abide by the Reorganization Agreement. Debtor admits he paid himself out of the Nurse Account more than the $2,500.00/month agreed upon compensation without Thompson's consent. During the time period in question, July-September 2010, Debtor paid himself approximately $2,190.96 and his mother approximately $6,485. Pls.' Ex. No. 38. Debtor acknowledges he paid the money from the Nurse Account and these were unauthorized payments; however, he argues they were entitled to additional compensation as a profit percentage equal to their percentage ownership in HRP. Pls. Ex. No. 9, ¶9. Thompson admits under the terms of the Reorganization Agreement, Debtor may have been entitled to additional compensation in at least one month, but he disputes Debtor was entitled to the amount of the payments actually taken. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, p. 177. Debtor points out that the Reorganization Agreement is silent on travel and supplies expenses and some of these checks were reimbursement for business expenses. Furthermore, the Reorganization Agreement was signed in February and it was not until July that Debtor and his mother accessed the Nurse Account. After observing Debtor and considering his credibility and based upon the totality of the circumstances, the most that could be said is Debtor's use of the Nurse Account to pay himself was

unauthorized but it does not rise to level of fraud sufficient to deny the discharge of this debt under §523(a)(2).  See In re Triggiano, 132 B.R. 486, 490 (Bankr. M.D. Fla. 1991)("[T]he most that could be said is that the Debtor's alleged service to family members and use of petty cash were unauthorized uses of corporate funds.  In sum, the claim of nondischargeability under §523(a)(2)(A) of the Bankruptcy Code cannot be sustained."). There is not enough evidence for which the Court can infer a fraudulent intent at the time the Reorganization Agreement was entered.  For these reasons, I find the Plaintiffs have failed to meet their burden to establish that this conduct constitutes fraud contemplated by §523(a)(2).

Next, Plaintiffs argue in late September 2010, they relied upon accounts receivable reports made by Debtor to monitor and protect their $100,000.00 loan and thus when Debtor shut down the business, they requested and agreed to pay Debtor to collect the accounts receivable for a fee.  Plaintiffs argue the report given on September 27, 2010 showing $123,540.32 of accounts receivable induced them not to attempt to immediately collect the accounts receivable.  Debtor acknowledges that the reports were not totally accurate.  He further contends he did nothing to inflate this figure or mislead Plaintiffs.  In fact, Debtor told

Plaintiffs the business was closing and he offered to allow Plaintiffs to collect the accounts receivable. After considering the matter, Plaintiffs initially requested that Debtor handle the collections since he had the personal contacts with the hospitals and they agreed to pay Debtor 1% of the accounts collected. Plaintiffs did not want to announce the closing for fear of diminishing the collectability of the accounts receivable and they thought Debtor would have a higher collection rate. After agreeing to this arrangement, Debtor collected the accounts receivable, but instead of depositing them into the T. Factor account as agreed, he diverted the funds and paid the IRS debt.

Debtor testified he thought the IRS was entitled to be paid ahead of Plaintiffs. Furthermore, he claims he wanted transparency so he had the funds deposited into and paid from his personal bankruptcy attorney's trust account. Debtor argues the IRS debt is a legitimate business debt of HRP that needed to be paid and he thought Thompson also benefited from the payment because he too may have been a "responsible person"[4] due to Thompson's control and involvement in HRP.

---

[4]  26 U.S.C. §6672 provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect

On the $44,462.27 payment to the IRS, I find Debtor's conduct constitutes conduct sufficient to deny the discharge of this debt.   Debtor agreed to continue collecting the receivables for a fee, but he immediately diverted the funds to his personal bankruptcy attorney.   The parties' relationship was acrimonious after the September meeting.   Debtor no longer responded to phone calls from Plaintiffs and Plaintiffs had to file a complaint for an accounting.   Four of the nine checks delivered to Debtor's personal bankruptcy attorney are dated in September; however, according to Debtor, he did not receive any before October. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012, pp. 113-15.   On

---

> such tax, or truthfully account for and pay
> over such tax, or willfully attempts in any
> manner to evade or defeat any such tax or the
> payment thereof, shall, in addition to other
> penalties provided by law, be liable to a
> penalty equal to the total amount of the tax
> evaded, or not collected, or not accounted
> for and paid over.

A responsible person under this Internal Revenue Code provision includes a corporate officer or employee of a corporation. Causey v. U.S., 683 F.Supp. 1381, 1383 (M.D. Ga. 1988).   In Causey, the creditor was not liable for tax penalties from taxes not withheld in the period prior to him becoming a responsible person.   Id. at 1386.   In our case, Thompson argues he cannot be liable for the 2008 tax penalties because the Reorganization Agreement which gave him extraordinary control over HRP and under which he became a director was not entered into until February of 2010.   Thompson was not a "responsible person" as defined by the Internal Revenue Code for the 2008 taxes and the IRS had not named him in any of the assessments.

October 14, 2010, seven checks Debtor had collected were deposited into his attorney's trust account and the remaining two were deposited on November 4, 2010 after the IRS debt was paid. Pls.' Ex. No. 42. Debtor's personal bankruptcy attorney made the IRS payment on October 19, 2010, 9 days before Debtor filed his bankruptcy petition. The checks reflect it was to pay HRP's payroll tax liability, but Debtor acknowledges he knew he was jointly and severally liable for these taxes and that these checks were remitted to and drawn from his personal bankruptcy attorney's trust account, not from HRP's counsel's trust account. Debtor filed for bankruptcy on October 28, 2010.

In this regard, I find Debtor's conduct shows he never intended to remit these funds to Plaintiffs. Debtor was personally liable for this debt. In fact, Debtor would not be entitled to discharge this debt in his personal bankruptcy. See 11 U.S.C. §523(a)(14). His bankruptcy counsel represented him individually not HRP. In September 2010, Debtor made a representation that he would collect the accounts receivable but I find he never intended to remit the checks to Plaintiffs. This is not the case where the debtor is trying to keep a struggling business afloat. HRP had already ceased operations. All that remained was his collection and remittance of these funds to the

Plaintiffs. Contrary to his agreement, Debtor diverted these funds to the IRS. While the IRS debt is a legitimate debt,[5] I find Debtor made a false representation that he would collect these funds and remit them to Plaintiffs. Plaintiffs' reliance upon this misrepresentation was justified and they sustained a loss as a result. See In re Berghman, 235 B.R. 683, 692 (Bankr. M.D. Fla. 1999)(finding the debtor's diversion of a creditor's payments to his personal use nondischargeable under §523(a)(2) where debtor had represented that payments would be turned over to the creditor). After observing the parties' demeanor and based upon the evidence before me, I find this debt to Plaintiffs in the amount of $44,462.27 is non-dischargeable pursuant to §523(a)(2).

## 11 U.S.C. §523(a)(4)

Plaintiffs also argue Debtor is guilty of embezzlement and larceny. Pursuant to 11 U.S.C. §523(a)(4):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

---

[5] The analysis in the §523(a)(6) section of this opinion addressing priority is incorporated by reference.

AO 72A
(Rev. 8/82)

11 U.S.C. §523(a)(4).

At the trial, when questioned whether Debtor served in a fiduciary capacity to Plaintiffs, Plaintiffs were unclear and indicated that larceny or embezzlement may be more appropriate. However, in the post-hearing brief, Plaintiffs argue Debtor acted in a fiduciary capacity. After considering the matter, I deny Plaintiffs' request to deny the discharge of the debt because of Debtor's conduct in a purported fiduciary capacity. See In re Riddle, 2011 WL 2461896 (Bankr. N.D. Ga. April 6, 2011)(stating "[T]he general fiduciary duty that Georgia corporate law imposes on a corporate officer does not establish the type of technical trust that is necessary to except a debt from discharge based on fraud or defalcation in a fiduciary capacity."); In re Wheelus, 2008 WL 372470 *3 (Bankr. M.D. Ga. Feb. 11, 2008)(rejecting argument that Georgia's limited liability company statutes establish a fiduciary relationship for purposes of §523(a)(4)). Given the facts and circumstances of this case, Debtor was not acting in a fiduciary capacity as contemplated by §523(a)(4).

Larceny is a "felonious taking of another's personal property with the intent to convert it or deprive the owner of the same." In re Langworthy, 121 B.R. 903, 907 (Bankr. M.D. Fla. 1990) citing Black's Law Dictionary, 5th Ed. Larceny requires

property to be taken without consent and against the will of the owner with felonious intent.   Debtor came into the $100,000.00 and the $44,462.27 lawfully and therefore, larceny is inapplicable.

Embezzlement is the appropriation or conversion of another's property while the property is legally in offending party's possession.  <u>Am. Gen. Fin., Inc. v. Heath (In re Heath)</u>, 114 B.R. 310, 311 (Bankr. N.D. Ga. 1990).   In the current case, the funds were owned by HRP and subject to the security interest of Plaintiffs.    Plaintiffs did not own the funds and therefore a claim of embezzlement cannot be sustained under the facts and circumstances of this case.[6]   See <u>First Nat'l Bank of Fayetteville, Arkansas v. Phillips (In re Phillips)</u>, 882 F.2d 302, 304-305 (8th Cir. 1989)(where debtors owned the funds subject to the creditor's security interest, embezzlement cannot be established); <u>In re Heath</u>, 114 B.R. at 312 (where property was owned by debtor subject to creditor's security interest, the debt could not be for larceny or embezzlement); <u>WLH, LLC v. Spivey (In re Spivey)</u>, 440 B.R. 539, 546 (Bankr. W.D. Ark. 2010)(petty cash

---

[6]   This analysis differs from the §523(a)(2) analysis whereby I denied the discharge of the $44,462.27 based upon Debtor's fraudulent misrepresentation that he would remit the funds to Plaintiffs.   The §523(a)(6) claim is based upon the injury to Plaintiffs' security interest and position, not the loss of their money through embezzlement.

belonged to corporation and not to investors and therefore investors could not bring embezzlement claim under §523(a)(4)).

## 11 U.S.C. §523(a)(6)

Pursuant to 11 U.S.C. §523(a)(6), a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge. 11 U.S.C. §523(a)(6). A debt for "a deliberate or intentional injury not merely a deliberate or intentional act that leads to injury" is nondischargeable. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). An injury is willful when the injury or consequence itself was intended or substantially certain to result. Id. at 61; Hope v. Walker (In re Walker), 48 F.3d 1161, 1165 (11th Cir. 1995). An injury is malicious when it is "wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill will." Walker, 48 F.3d at 1164. "[T]he injury must invade the creditor's legal rights ... 'in the technical sense, not simply harm to a person.'" In re Musilli, 379 F. App'x 494, 498 (6th Cir. 2010)(listing conversion as a type of misconduct that satisfies willful and malicious injury).

A breach of a security agreement in the course of operating a business generally does not rise to the level of a willful and malicious injury. See Kawaauhau, 523 U.S. at 62 (rejecting an

interpretation of §523(a)(6) which would render a knowing breach of contract nondischargeable); In re Zwosta, 395 B.R. 378, 386 (B.A.P. 6th Cir. 2008)(denying a summary judgment motion and stating that a question of fact remained as to whether injury to creditor was willful and malicious existed where debtor paid corporation's trust fund taxes when creditor had a superior security interest in the funds). However,

> Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge.

Barclays Amer./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 881 (8th Cir. 1985)(emphasis added); see In re Glatt, 315 B.R. 511, 521-22 (Bankr. D.N.D. 2004)(where debtor used the proceeds of creditor's collateral to continue operating his business, the court held the requisite malice was not present).

As far as paying himself out of the Nurse Account, as previously discussed, Plaintiffs have not sufficiently established that Debtor was not entitled to the compensation or reimbursement for legitimate business expenses. Based upon the evidence at trial, I do not find Plaintiffs' debt for the monies taken from the Nurse Account or the receipt of the $100,000.00

AO 72A
(Rev. 8/82)

loan from Plaintiffs to be excepted from discharge for willful and malicious injury to Plaintiffs.

Conversely, turning to the payment of the IRS debt, under the circumstances of the case, I find Debtor acted with the requisite malice as to the money diverted to pay the IRS debt. In the current case, Debtor consciously chose to use the accounts receivable to pay a business debt of HRP for which he was personally liable. The parties' relationship had become acrimonious after the September meeting. Debtor was no longer communicating with Plaintiffs. Debtor immediately diverted the funds to his _personal_ bankruptcy attorney's trust account to pay the debt for which he was _personally_ liable. This attorney did not represent HRP. In fact, pre-petition, in October 2010, Plaintiffs contacted HRP's attorney, Mr. Trotter to try and get an accounting of the accounts receivable and to contact the hospitals. Debtor knew the Plaintiffs were not going to pay the IRS, and he knew he could not discharge this debt. Dckt. No. 49, Tr. of Hr'g held Feb. 28, 2012. pp. 107-108 and 119. Rather than address this reality, Debtor opted to pay these taxes through his personal attorney's trust account in breach of his agreement with the Plaintiffs.

AO 72A
(Rev. 8/82)

Furthermore, unlike the Long and Glatt cases, this is not a business struggling to survive, rather this a situation where Debtor was struggling to shed himself of as much personal liability as possible. Plaintiffs purportedly had a superior interest to the IRS. See In re Zwosta, 395 B.R. at 386 ("[B]ecause [the creditor] was a perfected secured creditor with a valid security interest in the accounts receivable of [the corporation], its interest in [the corporation's] after-acquired funds was superior to that of the IRS, notwithstanding the Debtors' payment of the funds to the IRS."). I find contrary to his agreement with Plaintiffs, Debtor intended to permanently deprive the Plaintiffs of their property interest in the collateral. After considering the facts and circumstances of this case and observing Debtor's demeanor, I find Debtor acted willfully and maliciously intending to injure Plaintiffs and therefore $44,462.27 is excepted from discharge pursuant to §523(a)(6).

For the foregoing reasons, it is therefore ORDERED that Plaintiffs' complaint seeking to deny Debtor a discharge is DENIED and further ORDERED that Plaintiffs' debt in the amount of

$44,462.27 is not subject to discharge by Debtor.

_____
SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia

this **25th** Day of September 2012.

AO 72A
(Rev. 8/82)